**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                    :
WALTER GOMEZ,                                       :
                                                    :
             Plaintiff,                             :
                                                    :           Civil Action No. 06-4685 (JAG)
             v.                                     :
                                                    :                   **OPINION**
COMMISSIONER OF SOCIAL                              :
SECURITY,                                           :
                                                    :
             Defendant.                             :
_____:


**GREENAWAY, JR., U.S.D.J.**

Plaintiff Walter Gomez (the "Plaintiff") seeks review of the Social Security

Commissioner's (the "Commissioner") decision denying his application for Social Security

Disability Insurance Benefits ("SSDI"), pursuant to 42 U.S.C. § 405(g)(2000).[1]  Plaintiff asserts

that the Commissioner's decision was not supported by substantial evidence, as required by

42 U.S.C. § 405(g), and that the Commissioner erred in law and fact by denying the application.

For the reasons set forth in this Opinion, this Court vacates the Commissioner's final decision

denying disability benefits and remands this case for a new hearing, in accordance with this

opinion, the Social Security Act, and applicable regulations, Social Security rulings, and case

_____

[1] This section of the Social Security Act (the "Act") provides that any individual who was
a party to a hearing before the Secretary may commence a civil action within 60 days after the
Secretary's final determination.  The appropriate forum for this action is the district court of the
United States judicial district in which the plaintiff resides.  42 U.S.C. § 405(g).

law.

# I. PROCEDURAL HISTORY

On August 9, 2004, Plaintiff filed an application for SSDI, alleging disability since

February 4, 2004.  (Tr. 46.)[2]  Upon a review of the evidence, the Social Security Administration

denied Plaintiff's claim initially on September 23, 2004 (Tr. 24) and upon reconsideration on

December 1, 2004 (Tr. 32-34).  Subsequently, Plaintiff sought a hearing before an administrative

law judge to review the application *de novo*.[3]  On March 1, 2006, Administrative Law Judge

Dennis O'Leary ("ALJ O'Leary") issued his decision (Tr. 11-20), based upon a hearing held on

February 7, 2006 (Tr. 157-88).  Below is a summary of his findings:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2008."  (Tr. 16.)

2. "The claimant has not engaged in substantial gainful activity at any time relevant to [the ALJ's decision on March 1, 2006] (20 CFR [sic] 404.1520(b))."  (Id.)

3. The claimant's back injury (herniated disk[4] at L4-L5 and L5-S1) is a severe impairment under 20 C.F.R. § 404.1520(c).  (Id.)

4. "The claimant does not have an impairment or combination of impairments that meets

---

[2]  "As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."  42 U.S.C.A § 405(g).  "Tr." refers to said transcript.

[3] If the claimant "receives an adverse reconsideration determination, he is entitled to an evidentiary hearing and *de novo* review by an administrative law judge."  Heckler v. Day, 467 U.S. 104, 106 (1984).

[4] A herniated disk is "a rupture of the fibrocartilage surrounding an interverbral disk, releasing the nucleus pulposus that cushions the vertebrae above and below.  The resultant pressure on spinal nerve roots may cause considerable pain and damage the nerves, resulting in restriction of movement.  The condition most frequently occurs in the lumbar region."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 808 (6th ed. 2002) (hereinafter "MOSBY'S").

or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR [sic] 404.1520(d), 404.1525 and 404.1526)."  (Id.)

5. "[T]he claimant has the residual functional capacity[5] to perform the full range of sedentary work."  (Tr. 17.)

6. "The claimant is unable to perform any past relevant work (20 CFR [sic] 404.1565)." (Tr. 18.)

7. "The claimant was born on August 8, 1976 and was twenty-seven years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR [sic] 404.1563)."  (Tr. 19.)

8. "The claimant has at least a high school education and is able to communicate in English (20 CFR [sic] 404.1564)."  (Id.)

9. "Transferability of job skills is not an issue in this case because the claimant's past relevant work was unskilled and performed at the was [sic] heavy level of exertion (20 CFR [sic] 404.1568)."  (Id.)

10. "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number [sic] in the national economy that the claimant can perform (20 CFR [sic] 404.1560(c) and 404.1566)."  (Id.)

11. "The claimant has not been under a 'disability,' as defined in the Social Security Act, from February 4, 2004 through [March 1, 2006] (20 CFR [sic] 404.1520(g))."  (Id.)

Based on these findings, ALJ O'Leary concluded that Plaintiff was not disabled, pursuant to

sections 216(i) and 223(d) of the Act, and therefore was not entitled to disability insurance

benefits.  (Tr. 20.)  On July 28, 2006, the Social Security Administration Appeals Council

affirmed ALJ O'Leary's March 1, 2006 decision.  (Tr. 4.)  Plaintiff subsequently filed this action,

seeking review of the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g).  (Compl.

¶1.)

---

[5] Residual functional capacity is an assessment to determine what work activities the claimant can perform despite his impairment(s).  20 C.F.R. § 404.1545(a) (2003).

## STATEMENT OF THE FACTS

### A. Background

Plaintiff Walter Gomez is a male born on August 8, 1976 (Tr. 161) and is not currently working, allegedly due to his claimed disability (Tr. 54).  He has received his GED (Tr. 58), and understands, speaks, reads, and writes English (Tr. 53).  Until the date of his injury, February 4, 2004 (Tr. 54, 166), Plaintiff worked as a warehouse worker driving a forklift for IKEA (Tr. 162) and as a pizza delivery driver (Tr. 163).  His job at IKEA involved lifting and carrying around 75 to 100 pounds (Tr. 163) of merchandise, mattresses, and sofas (Tr. 51).  However, Plaintiff has also stated that the heaviest weight he would lift was 100 pounds or more and lifted 50 pounds or more from 1/3 to 2/3 of the workday.  (Tr. 51.)  His eight hour workdays included two hours of walking; two hours of standing; six hours of sitting; one hour each of stooping, kneeling, crouching, crawling, reaching; one hour of handling, grabbing, or grasping big objects; and one hour of handling small objects, writing, or typing.  (Tr. 55.)

Plaintiff currently does not work (Tr. 165) but participates in a program sponsored by the Division of Vocational Rehabilitation (DVR), a state agency that provides vocational rehabilitation to individuals with disabilities.  (Tr. 173.)  This includes full-time vocational training in respiratory therapy at a junior college.  (Tr. 174.)  Plaintiff attends one class per day and one day with two classes.  (Tr. 176.)  One of these classes is a two hour chemistry lab, during which Plaintiff alternates between sitting and standing.  (Tr. 181.)

### B. Claimed Disability

Plaintiff alleges disability since February 4, 2004 (Tr. 166), when he injured his lower back when, while driving a standup forklift, he was thrown backwards into a metal rack (Tr. 111,

4

131).  Plaintiff alleges the resulting back pain limits his ability to stand for more than thirty

minutes, to walk for more than one block, to lift more than ten pounds, or to sit comfortably

without changing position for more than twenty minutes.  (Tr. 172-73.)  Plaintiff testified that his

back pain prevents him from working daily for six to seven hours on a sustained basis.  (Tr. 180.)

As a result, Plaintiff stopped working after this injury on February 4, 2004.  (Tr. 165.)

**B. Medical Evidence**

The record indicates that Plaintiff received medical attention for the alleged injury on

several occasions.

1. Examination by Newark Airport Medical Offices[6]

From February 4, 2004 to June 23, 2004, Plaintiff received examinations, an x-ray, and

physical therapy at the Newark Airport Medical Offices.  (Tr. 140-48.)  The record diagnosed the

injury as herniated nucleus pulposus[7] (HNP) of the L4/L5 and L5/S1[8] regions of the spine.

2. Examination by Dr. John McCormick[9]

Dr. John McCormick, a radiologist, conducted a magnetic resonance imaging (MRI) of

---

[6] Although documentation in this part of the record is mostly illegible, neither the ALJ's decision nor the brief submitted by Plaintiff relies on facts or expert opinion exclusively provided in these documents.

[7] Nucleus pulposus is "the central part of each intervertebral disk, consisting of a pulpy elastic substance that loses some of its resiliency with age.  The nucleus pulposus may be suddenly compressed and squeeze out through the annular fibrocartilage, causing a herniated disk and extreme pain."  MOSBY'S 1198 (6th ed. 2002).

[8] L4/L5 refer to the fourth and fifth lumbar vertebrae.  S1 refers to the first sacral nerve in the sacral plexus. MOSBY'S 1615 (6th ed. 2002).

[9] Although the "List of Exhibits" (Tr. 1-3) attributes the MRI report to John Dellorso, M.D. (Tr. 2), the MRI report was reviewed and released by reading radiologist, Dr. John McCormick (Tr. 128).

Plaintiff's lumbar spine.  One of his impressions was that the "[r]ight paracentral recurrent or residual disc herniation L4-5 produc[es] a right ventral[10] dural[11] deformity resulting in moderate central spinal stenosis.[12]  Enhancing scar surrounds the right L5 nerve root sheath[13] within the lateral recess."  (Tr. 128.)   The other impression was that "[r]ecurrent or residual right paracentral disc herniation L5-S1 imping[es] upon the right S1 nerve root sheath with enhancing ventral epidural[14] scar."  (Id.)

    3. Examination by Dr. Michael H. Rieber

On March 15, 2004, Dr. Michael H. Rieber, an orthopedic surgeon, examined and treated Plaintiff.  (Tr. 131.)  He observed that Plaintiff had limited range of motion and lower back pain. He continued Plaintiff's conservative treatment plan, but added two medications – Skelaxin and Vicodin – in addition to the Vioxx Plaintiff was already taking.  (Id.)  Dr. Rieber also recommended physical therapy.  (Id.)

On April 5, 2004, Dr. Rieber noted that Plaintiff continued to experience lower back pain

---

[10] Ventral is defined as "pertaining to a position toward the anterior surface or abdominal region."  MOSBY'S 1802 (6th ed. 2002).

[11] Dural pertains to dura mater, "the outermost and most fibrous of the three membranes surrounding the brain and spinal cord."  MOSBY'S 558 (6th ed. 2002).

[12] Stenosis is "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  MOSBY'S 1630 (6th ed. 2002).

[13] Sheath is "a tubular structure that surrounds an organ or any other part of the body, such as the sheath of the rectus abdominis muscle or the sheath of Schwann, which covers various nerve fibers."  MOSBY'S 1573 (6th ed. 2002).

[14] Epidural is defined as "outside or above the dura mater."  MOSBY'S 614 (6th ed. 2002).

and, on rare occasions, radicular[15] complaints down his leg.  (Tr. 130.)  Dr. Rieber observed

some mild tenderness to the paraspinal muscle of the lower back but noted that Plaintiff's range

of motion had improved.  He also noted Plaintiff remained "neurologically intact with good

strength and reflexes as he had before."  (Id.)    He recommended that Plaintiff take Medrol

Dosepak and continue physical therapy.  (Id.)  However, on April 14, 2004, Dr. Rieber found

Plaintiff's symptoms continued, and he recommended Plaintiff consult spinal surgeons Dr.

Kenneth Kopacz[16] and Dr. Casey Lee and obtain lumbar epidurals for the pain at the Ambulatory

Care Center at St. Barnabas.  (Tr. 129.)

       4. <u>Examination by Spine Care and Rehabilitation, Inc.</u>

       Dr. Kenneth J. Kopacz, an orthopedic spine surgeon at Spine Care and Rehabilitation,

Inc., examined Plaintiff on April 26, 2004.  (Tr. 111.)  He concluded, from the MRI taken on

March 4, 2004, that Plaintiff has "mild to moderate recurrent disc herniations at L4-L5 and L5-

S1 on the right side . . . with a component of lumbar disc disruption at these two levels."  (Id.)

Dr. Kopacz's initial physical exam of Plaintiff confirmed decreased flexibility, with decreased

forward flexion and extension.  (Id.)  However, he found that Plaintiff is able to toe and heel

walk and Plaintiff's "strength is good, with 5/5 strength in all lower extremity groups, and he has

normal sensation to light touch and pinprick.  He has normal reflexes at the knee and ankle and

downgoing toes bilaterally."  (Id.)  Dr. Kopacz recommended a course of epidural steroid

injections and continued physical therapy.  (Id.)

---

    [15] Radicular is defined as "pertaining to a root, such as a spinal nerve root or radical."
MOSBY'S 1630 (6th ed. 2002).

    [16] Although Dr. Rieber's progress note has a blank space rather than Dr. Kopacz's name,
other reports from Dr. Lee and Dr. Kopacz have both full names. (<u>See</u> Tr. 132, 152-56.)

On May 17, 2004, Dr. Casey K. Lee, another orthopedic spine surgeon at Spine Care and Rehabilitation, Inc., examined Plaintiff after he had received an epidural steroid injection on May 4, 2004.  Dr. Lee observed Plaintiff's severe limitation of motion and tenderness of the lumbosacral[17] spine and continued pain in the low back area, posterior thigh, and left side buttocks.  (Tr. 110.)  Dr. Lee recommended continuing on Vioxx and another epidural steroid injection.  If neither improves the symptoms, he recommended surgery.  (Id.)  He stated that Plaintiff was "unable to tolerate any type of work, because of chronic severe low back pain." (Id.)

On June 21, 2004, Dr. Kopacz noted that Plaintiff's condition had improved after a third epidural steroid injection and that with a prescription for Vioxx and Ultram, Plaintiff should be slowly advanced and started on physical therapy to determine whether he can make a full recovery.  (Tr. 109.)

On July 26, 2004, contrary to Dr. Kopacz's assessment of the effectiveness of the epidural steroid injections, Dr. Lee found no significant improvement in the Plaintiff's symptoms and recommended a functional capacity assessment.  (Tr. 108.)

The functional capacity assessment performed by Advanced Physical Therapy Associates on August 10, 2004 (Tr. 100-06) was qualified as "conditionally valid" given Plaintiff's "submaximal effort" (Tr. 100).  The assessment found that Plaintiff's workday tolerance is eight hours, during which he can sit, stand, and walk.  (Id.)  Plaintiff was found capable of

---

[17] Lumbosacral is defined as "pertaining to the lumbar vertebrae and the sacrum." MOSBY'S 1026 (6th ed. 2002).

continuously[18] balancing; occasionally[19] crawling or climbing stairs; minimally occasionally

bending or stooping, squatting, and crouching; and not at all able to kneel.  (Id.)  He was

occasionally able to lift 12.6 pounds above his shoulders, from a desk to a chair, and from a chair

to the floor.  (Tr. 101.)  Plaintiff was occasionally able to carry 17.0 pounds, push 22.1 pounds,

and pull 17.7 pounds.  (Id.)

On August 16, 2004, Dr. Kopacz reviewed the findings of the functional capacity exam

and concluded that Plaintiff would be "able to pursue sedentary activity" and that he should

receive vocational rehabilitation for a job more suitable to his physical limitations.  (Tr. 107.)

Dr. Kopacz also suggested that Plaintiff had "reached maximal medical benefit" and there was

"no need for surgical intervention, since the results of a two-level fusion[20] may not get him any

further than his sedentary work position."  (Id.)

On October 11, 2004, Dr. Kopacz noted that Plaintiff "continue[d] to complain of pain,

especially down his left leg . . . ."  (Tr. 156.)  He recommended Plaintiff use a TENS[21] unit to

---

[18] The term "continuous" refers to a time period of over 5.5 hours (67% to 100% of the workday) during which a client is capable of engaging in a specified activity.  (Tr. 100.)

[19] The term "occasional" refers to a time period between 0 to 2.5 hours (1% to 33% of the workday) during which a client is capable of engaging in a specified activity.  (Tr. 100.)

[20] Fusion is defined as "the surgical joining of two or more vertebrae, performed to stabilize a segment of the spinal column after severe trauma, herniation of a disk, or degenerative disease.  Under general anesthesia the cartilage pads are removed from between the posterior parts of the involved vertebrae.  Bone chips are cut from one of the patient's iliac crests and inserted in place of the cartilage, fusing the articulating surfaces into one segment of bone."  MOSBY'S 715 (6th ed. 2002).

[21] Transcutaneous electrical nerve stimulation (TENS), is "a method of pain control by the application of electric impulses to the nerve endings.  This is done through electrodes that are placed on the skin and attached to a stimulator by flexible wires.  The electric impulses generated are similar to those of the body, but different enough to block transmission of pain signals to the

alleviate his symptoms.  However, on November 8, 2004, Dr. Kopacz observed that the TENS

unit benefitted Plaintiff only intermittently and he (Plaintiff) continued to experience severe pain.

(Tr. 155.)

On December 20, 2004, Dr. Kopacz stated that "[Plaintiff] continues to be disabled, and

that [Dr. Kopacz] do[es] not feel that he will return to any gainful activities with heavy work."

(Tr. 154.)  Dr. Kopacz started Plaintiff on Relafen, continued him on Ultram, and recommended

beginning a weight loss program.  (Tr. 154.)  On January 24, 2005 and November 15, 2005, Dr.

Kopacz observed that Plaintiff continued to experience pain.  (Tr. 152-53.)  He discussed with

Plaintiff the possibility of Intradiscal Electrothermal Therapy[22] (IDET) (Tr. 152).  However, Dr.

Kopacz admits IDET is not likely to be very successful, and Plaintiff will likely need a major

operative procedure for any substantial improvement.  (Id.)

5. Examination by Dr. Richard S. Nachwalter

Dr. Richard S. Nachwalter, an orthopedic spine surgeon, issued a medical evaluation of

Plaintiff dated June 17, 2004, prior to Plaintiff's third epidural injection.  In the evaluation, he

reviewed Plaintiff's medical history (Tr. 137-38) and confirmed the diagnoses of (1) "[r]ecurrent

disc herniation" and (2) "[l]umbar degenerative disc disease" (Tr. 138).  He observed that

Plaintiff suffered from a "fair amount of back pain and his back pain is equal to his leg pain."

(Id.)  Dr. Nachwalter states that Plaintiff's prognosis was good, but if his symptoms persist after

---

brain.  TENS is noninvasive and nonaddictive, with no known side effects."  MOSBY'S 1736 (6th
ed. 2002).

[22] IDET is a procedure whereby two wires are inserted into a spinal disc and an electric
current is used to cauterize the disc by shrinking it.  (Tr. 183.)  The procedure is intended to be
less invasive than an actual operation or a fusion.  (Id.)

his third epidural then Plaintiff can either "live with his symptoms or pursue surgery in hopes that his pain is improved."  (Id.)

      6. Testimony of Dr. Albert G. Mylod

      At the hearing on February 7, 2006 before the ALJ, Dr. Albert G. Mylod,[23] an orthopedic surgeon, testified as a paid expert on behalf of Plaintiff.  (Tr. 182-88.)  Dr. Mylod's testimony was based on his review of Plaintiff's file.  (Tr. 182.)  He testified that Plaintiff suffered from herniated discs, L4-5 and L5-S1, in his back.  (Id.)  Dr. Mylod states that this injury restricts Plaintiff's residual functional capacity[24] (RFC) and that Plaintiff's ability to stand, walk, and sit is restricted to less than sedentary.  (Tr. 187.)  According to Dr. Mylod, Plaintiff cannot sustain any activity, such as standing, walking, or sitting, for a 6 to 8 hour day.  (Tr. 186.)

**DISCUSSION**

      A. Standard of Review

      This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g), and must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

---

    [23] Although the transcript of the hearing does not refer to Dr. Mylod by name, the ALJ's decision indicates that Dr. Mylod was the medical expert testifying before the ALJ at the hearing on February 7, 2006.  (Tr. 18.)

    [24] Residual functional capacity is the most a claimant can still do in a work setting despite his or her physical and mental limitations due to his or her impairments and related symptoms such as pain.  20 C.F.R. § 404.1545(a).

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

To determine if substantial evidence exists to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  Blalock, 483 F.2d at 775.

B. Statutory Standards

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for SSDI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is

unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, an impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

      C. The Five Step Evaluation Process and the Burden of Proof

      Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[25]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

      At step two, the Commissioner must determine whether the claimant suffers from a severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining

---

[25] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[26] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to

---

[26] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

perform his past relevant work, he will not be found disabled under the Act.  In <u>Burnett</u>, the

Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

<u>Burnett</u>, 220 F.3d at120.  If the claimant is unable to resume his past work, and his condition is

deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy

which the claimant can perform, consistent with his medical impairments, age, education, past

work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds

a significant number of jobs that claimant can perform, claimant will not be found disabled.  <u>Id.</u>

When the claimant has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the

burden of establishing the existence of jobs in the national economy.  These guidelines dictate a

result of "disabled" or "not disabled" according to combinations of vocational factors, such as

age, education level, work history, and residual functional capacity.  These guidelines reflect the

administrative notice taken of the jobs in the national economy that exist for particular

combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph

200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the

evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion

as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

D. Subjective Complaints of Pain

An ALJ may not ignore a claimant's subjective complaints of pain when evaluating a

disability claim, "particularly where the claimant registers such complaints not only at the

administrative hearing, but also during examinations by her physician, as reflected in his

contemporaneous reports and notes." Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986).

Although there must be objective medical evidence of a condition which could produce pain,

objective evidence of pain itself is not required. Green v. Schweiker, 749 F.2d 1066, 1071 (3d

Cir. 1984). The Third Circuit requires:

> (1) that subjective complaints of pain be seriously considered, even where
> not fully confirmed by objective medical evidence; (2) that subjective pain
> "may support a claim for disability benefits" and "may be disabling;" (3)
> that when such complaints are supported by medical evidence, they should
> be given great weight; (4) that where a claimant's testimony as to pain is
> reasonably supported by medical evidence, the ALJ may not discount
> claimant's pain without contrary medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted). An individual's

description of his or her pain or symptoms, although relevant, is not conclusive in itself. 42

U.S.C. § 423(d)(5)(A). Symptoms, such as pain, "will not be found to affect [the claimant's]

ability to do basic work activities unless medical signs or laboratory findings show that a

medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b).

E. Seven Part Test for Considering Pain

According to 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), the Social Security

Administration will consider a claimant's symptoms in its determination of disability. This

consideration includes the following seven factors related to claimant's symptoms: (i) the extent

of daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms;

(iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of

any medication taken to alleviate pain or other symptoms; (v) treatment other than medication for the pain and other symptoms; (vi) any measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.

F. Weight Accorded to Evidence

The Social Security Administration considers all submitted opinions to evaluate a claim for disability benefits. 20 C.F.R. § 404.1527(b). If the medical evidence presented is inconsistent, the evidence will be weighed in order to reach a decision. 20 C.F.R. § 404.1527(c)(2).

G. ALJ O'Leary's Findings

ALJ O'Leary performed the five step evaluation and concluded that Plaintiff was not disabled, as defined in 20 C.F.R. § 404.1520. (Tr. 19.)

*1.* ***Step One***

ALJ O'Leary found that Plaintiff satisfied step one of the evaluation process because he "has not engaged in substantial gainful activity at any time relevant to this decision." (Tr. 16.) However, he is currently a full-time college student. (Id.)

*2.* ***Step Two***

ALJ O'Leary found Plaintiff's disc herniation at L4-L5 and L5-S1 qualified as a severe impairment under 20 C.F.R. § 404.1520(c). (Id.)

*3.* ***Step Three***

Relying on the results of Dr. Nachwalter's physical examination of the Plaintiff (Tr. 138) and medical listing 1.04(c) in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526), ALJ O'Leary found Plaintiff's impairments did not

meet or medically equal one of the listed impairments.  (Tr. 16-17.)

### 4.      Step Four

ALJ O'Leary found that Plaintiff had "the residual functional capacity to perform the full

range of sedentary work."  (Tr. 17.)  This assessment was based on ALJ O'Leary's impressions

of Plaintiff's activities in his chemistry lab course (id.) and Dr. Lee's evaluation (Tr. 107).

However, Plaintiff's severe impairment precluded his performance of any past relevant work.

(Tr. 18.)

### 5. Step Five

ALJ O'Leary found that "[c]onsidering the claimant's age, education, work experience,

and residual functional capacity, there are jobs that exist in significant number in the national

economy that the claimant can perform."  (Tr. 19.)  ALJ O'Leary based this conclusion on

Plaintiff's "testimony that he has attended classes for more than one year studying respiratory

therapy, a line of work performed at the light exertional level, with the presumption of pursuing a

career in this field, . . . ."  (Tr. 19.)

## ANALYSIS

Plaintiff contends that ALJ O'Leary's decision should be reversed because "substantial

evidence exists in the administrative record to support a finding of disability" or in the

alternative, remanded "for reconsideration in light of the numerous deficiencies in the Hearing

decision . . . ." (Br. in Support of Pl. Walter Gomez 1 [hereinafter "Pl's Br."].)  Plaintiff contends

that the ALJ: (A) "fail[ed] to address Plaintiff's assertion that his staged surgical procedures are

equivalent to 1.08 of the commissioner's listings," (id. at 21); (B) made pain findings that

violated the Commissioner's published ruling and regulatory interpretations, (id. at 23); and

(C) failed to explain the evidentiary basis for his conclusion that Plaintiff can perform the full

range of sedentary work, (id. at 28).

This Court will not reverse the ALJ's decision on the basis suggested by Plaintiff that evidence exists in the record to support a finding of disability.  This Court cannot weigh the evidence and cannot substitute its conclusions for that of the fact finder, Williams, 970 F.2d at 1182, even if evidence exists that may support a different conclusion, Blalock, 483 F.2d at 775. However, it is within the jurisdiction of this Court to determine whether to remand this case for further development of the relevant issues.  See, e.g.  Burnett, 220 F.3d 112; Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981).

### Issue A: Whether the ALJ failed to find that Plaintiff's impairments did not equal listing 1.08

Plaintiff argues that, in the third step of the sequential evaluation, the ALJ failed to address why he did not consider listing 1.08 in determining medical equivalence.  (Pl's Br. 22.) He contends that he "argued, through his medical expert, that he was the equivalent of both 1.04 and 1.08."  (Id.)  This argument misrepresents the testimony of Dr. Mylod.  With respect to listing 1.08, Dr. Mylod testified only that "you might consider a stretch for [Plaintiff's] argument of being 108 [sic]," and that it might be "something that might evolve over the next couple years . . . ." (Tr. 185.)  This testimony does not indicate that listing 1.08 applies to Plaintiff.  Rather, Dr. Mylod's testimony indicates that listing 1.08 does not apply at the present time.  Therefore, Dr. Mylod's testimony actually belies Plaintiff's assertion that listing 1.08 pertains to him.

In addition, Plaintiff fails to establish that the ALJ is required to explain his decision not to find medical equivalence with listing 1.08.   The ALJ has the responsibility to "determine the closest applicable listed impairment, based on the medical evidence, when examining whether a claimant's impairments meet or equal a listed impairment."   Burnett, 220 F.3d at 120.  However, this does not compel the ALJ to articulate his reasoning for not selecting listing 1.08 and every

other impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis . . . ."  <u>Jones v. Barnhart</u>, 364 F.3d 501, 505 (3d Cir. 2004).  Therefore, although the ALJ must articulate the reasoning behind his selection of listing 1.04(c) for purposes of this Court's judicial review, the ALJ need not explain why he did not select listing 1.08.

In this case, however, the ALJ fails to articulate his reasons for identifying 1.04(c) as the relevant listing.  The ALJ merely states that "[u]sing medical listing 1.04(c) as a reference, the claimant's symptoms do not meet or medically equal the criteria of a medical listing."  (Tr. 17.)  For meaningful judicial review of the ALJ's step three analysis, the ALJ must "set forth the reasons for his decision."  <u>Burnett</u>, 220 F.3d at 119.  The ALJ must accompany a step three ruling with "a discussion of the evidence and an explanation of reasoning supporting a determination that [Plaintiff's] 'severe' impairment does not meet or is not equivalent to a listed impairment."  <u>Id.</u> at 120.  Here, the ALJ identified the listing and referenced evidence but failed to provide any explanation of his reasoning as to how the evidence relates to the listing.

Therefore, since meaningful judicial review of ALJ O'Leary's medical equivalency determination cannot be provided for want of sufficient analysis, this Court must remand for further action.

***Issue B: Whether the ALJ decision's pain finding violates the Commissioner's published rulings and regulatory interpretations.***

The United States Court of Appeals for the Third Circuit has provided the following standard for reviewing an ALJ's opinion:

> In our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision.  This is necessary so that the court may

> properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the
> Secretary's decision is supported by substantial evidence.

Cotter, 642 F.2d at 705 (quoting Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974)).  More

recently, the Third Circuit held that "the ALJ's decision must include sufficient evidence and

analysis to allow for meaningful judicial review . . . ."  Rivera, 164 F. App'x at 262.

 Here, the ALJ's decision fails to explain adequately his reasoning, with respect to his

conclusion that "the claimant's statements concerning the intensity, duration and limiting effects

of [Plaintiff's] symptoms are not entirely credible."  (Tr. 17.)  Not only does the ALJ fail to

provide sufficient analysis to support this conclusion, but he also fails to reconcile this conclusion

with his prior conclusion that "the claimant's medically determinable impairment could

reasonably be expected to produce the alleged symptoms . . . ."  (Id.) (emphasis in original).

 The ALJ is required to "indicate that s/he has considered all the evidence, both for and

against the claim, and provide some explanation of why s/he has rejected probative evidence

which would have suggested a contrary disposition."  Cotter v. Harris, 650 F.2d 481, 482 (3d Cir.

1981).  Here, the ALJ recites evidence both for and against Plaintiff's claim but fails to articulate

how he reconciled that evidence to reach his conclusions.  As a result, this Court does not know

the basis for the ALJ's credibility determination, nor how the ALJ weighed the relevant  evidence.

Furthermore, the ALJ fails to articulate how he reconciled contradictory probative evidence

falling within the factors of the seven part test for considering pain, provided in 20 C.F.R.

§ 404.1529(c)(3).

 For example, the ALJ discusses at great length Plaintiff's daily activities, the first factor in

the seven part test, but does not explain how he resolves the inconsistencies in the facts presented.

In his discussion, the ALJ states that Plaintiff "is able to function independently" and "take care of

personal needs." (Tr. 17.) Three paragraphs later, however, the ALJ references testimony that Plaintiff has an "inability to cook, clean or cook meals." (Id.)

In addition, in his assessment of the credibility of Plaintiff's statements concerning the intensity, duration and limiting effects of his symptoms, the test's second factor, the ALJ recites observations made by Dr. Rieber on March 15, 2004. Dr. Rieber observed that Plaintiff had "minimal to no palpable tenderness, minimal spasm and that the claimant was able to forward flex barely to his knee, as well as side to side to knee level." (Tr. 17.) However, the ALJ fails to reconcile these indirect allusions to Plaintiff's pain with more direct observations. For example, the same report explicitly states that Plaintiff has pain in his lower back region (Tr. 131), and subsequent examinations by Dr. Rieber on April 5, 2004 and April 14, 2004 reveal that Plaintiff continued to experience low back pain with radicular complaints down his legs. (Tr. 130, 129.) Without explanation, ALJ O'Leary also neglects Dr. Kopacz's (Tr. 156), Dr. Lee's (Tr. 110), and Dr. Nachwalter's (Tr. 138) observations regarding Plaintiff's pain.

It appears that ALJ O'Leary attempts to use the history of claimant's treatments for pain reduction as evidence undermining the credibility of Plaintiff's statements concerning his pain. (Tr. 18.) However, the ALJ himself acknowledges that Plaintiff received multiple treatments because he "remained symptomatic" and "continued to complain of pain." (Tr. 18.) The ALJ leaves unexplained why Plaintiff's pain treatments – the TENS unit and three epidural injections – and pain medications – Vioxx, Ultram, Skelaxin, and Vicodin – are evidence that his statements about his pain are less credible rather than more. Additionally, ALJ O'Leary fails to resolve the conflicting medical opinions of Dr. Kopacz and Dr. Lee regarding the inefficacy of the aforementioned treatments and medications used to relieve his pain. (Tr. 108-09, 155).

This Court requires "an explanation from the ALJ of the reason why probative evidence

has been rejected . . . so that [this Court] can determine whether the reasons for rejection were improper." Cotter, 642 F.2d at 706-07. There is a "particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." (Id. at 706). However, ALJ O'Leary simply recites, without any accompanying explanation or analysis, evidence in the record of treatments and medication Plaintiff received for his pain. Similarly, ALJ O'Leary fails to reconcile the medical evidence, such as the opinions of Plaintiff's treating doctors, that conflict with the ALJ's conclusions and sometimes with each other. Therefore, due to the failure of the ALJ to articulate how he reconciled conflicting probative evidence on the record and made his credibility determination, this Court shall remand for further action.

***Issue C: Whether the ALJ decision does not explain the evidentiary basis for his conclusion that Plaintiff can perform the full range of sedentary work.***

Residual functional capacity assessments require a consideration of any subjective and objective evidence in the record of Plaintiff's pain. 20 C.F.R. § 404.1545(a)(3). Since this Court is remanding this case for further analysis of Plaintiff's allegations and evidence of his pain, it need not reach the issue of whether substantial evidence demonstrates that Plaintiff can perform the full range of sedentary work. The ALJ's elucidation regarding the remanded issues will, of necessity, resolve this issue.

24

## CONCLUSION

For the reasons stated above, this Court cannot find that the Commissioner's decision is supported by substantial evidence.  Therefore, this Court will remand this case for sufficient development of the record and explanation of findings to permit meaningful judicial review.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date:  September 5, 2008